THIM, J.
 

 The plaintiffs, Vincent R. Cappello and Irene M. Cappello, have brought this action to quiet and settle their title in real property pursuant to General Statutes § 47-31. They ask this court to declare invalid deed restrictions which prohibit them from using their property for business purposes. The defendants are the property owners who benefit from the restrictions. The issues were tried before this court. For the reasons stated below, this court denies the requested relief.
 

 The parties own property in a subdivision in Fairfield known as Lakeview Acres. All the lots in the subdivision are burdened with restrictions that prohibit the use of the lots for anything other than single-family dwellings. The restrictions were created in 1943 when the owners of the subdivision entered into an agreement subjecting the seventy-four lots in the subdivision to restrictive covenants. The lots are delineated on a map that was recorded in the land records of the town of Fairfield on September 16, 1943. That map is captioned, in part, as map number 1251. The agreement restricting the use of the lots was recorded in the same land records on October 20, 1943. The agreement shows a general plan of development which limits the use of the lots to single-family dwellings. “Such restrictions constitute negative easements which may be enforced by any grantee against any other grantee, each parcel becoming both a dominant and servient tenement.”
 
 Bickell
 
 v.
 
 Moraio,
 
 117 Conn. 176, 180, 167 A. 722 (1933). The right of each lot owner to have the restrictions continued in force is
 
 *455
 
 a property interest that he or she has in the subdivision.
 
 Harris
 
 v.
 
 Pease,
 
 135 Conn. 535, 540, 66 A.2d 590 (1949).
 

 The plaintiffs’ property consists of lots 1, 2 and the southern portions of lots 5 and 6 as delineated on map number 1251. The parcels are contiguous and, together, constitute a rectangular shaped parcel with 275 feet of frontage on the Boston Post Road and 111 feet of frontage on Hulls Highway, which intersects with the Boston Post Road. Lot 1 is a comer lot fronting on both the Boston Post Road and Hulls Highway and is improved with a single-family house. Lot 2 fronts on LIulls Highway and is improved with a single-family house that has been damaged by fire and is now unoccupied. The southern portions of lots 5 and 6 front on the Boston Post Road and contain no improvements. Vincent R. Cappello purchased lot 1 in 1971, the southern half of lot 5 in 1972, the southern half of lot 6 in 1980, and lot 2 in 1985. The property is now owned by Vincent R. Cappello and Irene M. Cappello.
 

 The defendants are the owners of the other property within the subdivision. Their lots front on Arbor Drive, Arbor Terrace and Hulls Highway. Three of the defendants testified: Charles McDonald, Ernest Sapp and Edward Byrne. McDonald relied on the long-term protection provided by the covenants when he purchased his home forty-one years ago. Sapp believed the covenants would protect the neighborhood when he purchased his home six years ago. Byrne was aware of the covenants when he purchased his home in 1986 and believed that they would keep the area as a single-family neighborhood.
 

 Lakeview Acres is a mature development consisting of single-family residences that have been improved over the years. No lots are being used for anything other than residential purposes. The rear lot lines of eight of
 
 *456
 
 the original lots abut the Boston Post Road. The plaintiffs own one of the abutting lots (lot 1) and the abutting portion of two other lots (lots 5 and 6). Since 1943, the Boston Post Road has undergone a dramatic change. Today, the property along the Boston Post Road from the Fairfield-Bridgeport border to the Fairfield-Westport border is used mostly for commercial purposes and is in a designed commerical district zone. Clearly, the best and highest use of the plaintiffs’ property would be commercial development. This use would be consistent with the uses along the Boston Post Road but inconsistent with the present use of the lots within Lakeview Acres.
 

 The plaintiffs seek relief from the restrictions on two alternative theories. First, they claim the restrictions on the plaintiffs’ property have been released over the years by the present or former owners of the lots in the subdivision. Second, they claim the essential character of the area has changed so that the court should nullify the restrictions as they pertain to the plaintiffs’ property. The defendants contest these claims.
 

 The first issue involves an inquiry into the manner in which the restrictions can be released and an inquiry into the effect of three quitclaim deeds signed by the present or former owners of some of the lots. A lot owner may extinguish his or her right to enforce the benefit of restrictive covenants by means of a written and recorded release. 9 R. Powell, Real Property (1996 Rev.) § 679 [1], p. 60-130. Generally, “all of the benefited property owners must join in a release in order to completely extinguish the obligation.” Id., p. 60-131. In the present case, all of the benefited owners have not joined in a release. The plaintiffs do not, however, contend each owner has released his or her interest in the restrictions. Instead, they claim paragraph eleven
 
 [1]
 
 of the document that created the restrictions in 1943 gave the
 
 *457
 
 owners of a majority of the lots the power to extinguish the interests of all. Paragraph eleven of the 1943 document provides that the restrictive covenants may be terminated, in whole or part, at the end of certain periods by an agreement executed by at least 51 percent of the then owners of the parcels of land, provided the agreement is recorded in the land records. The plaintiffs further claim a majority has extinguished the interests to all by executing three quitclaim deeds.
 

 The first quitclaim deed was executed between May 20, 1966 and December 31, 1968, by the owners of thirty-four of the lots. The deed was recorded on December 31,1968. The lot owners released their interest in lots 1, 2 and part of lot 5. Since thirty-eight lot owners were needed to meet the 51 percent requirement, this deed did not extinguish the interests of all the lot owners. The restrictions automatically continued on January 1, 1969, for a ten year period.
 

 The second quitclaim deed was signed between August 9, 1974 and September 21, 1977, by the owners of thirty-six lots and was recorded on December 6,1977. The owners released their interests to the southern half of lot 6. Because this deed was not signed by the owners of thirty-eight lots, it did not extinguish the interests of the lot owners who did not join as signatories.
 

 The third quitclaim deed was signed on May 7, 1988, by seven lot owners and was recorded on June 9, 1988.
 
 *458
 
 Some of the signers of the deed had previously released their interests in part of the plaintiffs’ property when they signed the second quitclaim deed. After taking account of the duplications, the effect of the third deed was that four more released their interests in lots 1, 2 and part of lot 5, and three more released their interests in the southern half of lot 6. The three deeds show that the plaintiffs have received releases from thirty-eight owners with respect to the restrictions on lots 1, 2 and part of lot 5, and thirty-nine lot owners with respect to the southern half of lot 6. The plaintiffs claim that their receipt of the third deed fulfilled the 51 percent requirement of paragraph eleven and that the restrictions on their property thereafter terminated at the expiration of the ten year period ending January 1, 1989. The defendants have two responses to this claim.
 

 The defendants first contend that the quitclaim deeds were merely revocable offers to terminate the restrictions and that the offers have been revoked. Both sides rely
 
 on Morgan v. Sigal,
 
 114 Conn. 39, 157 A. 412 (1931). The defendants cite that case for the proposition that the releases were revocable offers to take part in a termination agreement. Under their theory, a person’s offer lapsed when that person died or transferred his or her property. The plaintiffs cite that case for the proposition that a defendant could not revoke a release unless he or she recorded the revocation on the land records before the plaintiffs obtained the last release.
 

 The
 
 Sigal
 
 case is inapposite. The trial court in
 
 Sigal
 
 granted an injunction restraining the defendant from using his lot for mercantile purposes. A restrictive covenant allowed such use only if “consent” was obtained of the owners of three fourths of the lots within the development. Id., 43. Before the defendant obtained the required number of “consents,” he built his store. An issue at trial was whether a lot owner could withdraw his consent. A review of the records and briefs reveals
 
 *459
 
 that the trial court expressly found the consent at issue was not supported by consideration. “Not even a seal is affixed to his signature to import consideration, and there is no evidence and no claim made [during the trial] that any consideration was in fact paid therefor.”
 
 Morgan
 
 v.
 
 Sigal,
 
 Conn. Supreme Court Records & Briefs, October Term, 1931, Pt. 5, Record p. 15. The trial court concluded that the consent was a revocable license and that the defendant did not have a right to rely on the consents until the requisite number was obtained. Id. A lot owner could, therefore, withdraw his consent before the requisite number was obtained.
 

 When the owner of a dominant estate releases his or her interest in a servient estate, the releaser does more than merely grant a license to erect a structure. The giving of a license for a specific act, such as erecting a structure, is temporary in nature. If the structure erected in pursuance of the license is removed, the owner of the servient tenement cannot erect another structure without a new license.
 
 Stueck
 
 v.
 
 Murphy Co.,
 
 107 Conn. 656, 666, 142 A. 301 (1928). The giving of a release, on the other hand, extinguishes the releaser’s interest in the restrictions. In the present case, the releases were given by quitclaim deeds under seal with a statement that they were given “for the consideration of One Dollar and other valuable considerations received to our full satisfaction . . . .” The deeds also express an intention to bind the releasers, heirs, successors and assigns. The releases are not revocable.
 

 The defendants next claim that the quitclaim deeds did not meet the time requirements of paragraph eleven. Each side interprets paragraph eleven differently. The plaintiffs contend the paragraph authorizes the owners of 51 percent of the lots to terminate the interests of all the owners. The defendants contend paragraph eleven requires as a condition for termination that the owners
 
 *460
 
 of 51 percent of the lots agree contemporaneously that the restrictions be released.
 

 In ascertaining the temporal limitations of paragraph eleven of the 1943 agreement, this court must follow certain well known rules of construction. First, “[t]he words as written . . . must be accorded a fair and reasonable construction and their common, natural, and ordinary meaning and usage where it can sensibly be applied.” (Internal quotation marks omitted.)
 
 Albert Mendel & Son, Inc.
 
 v.
 
 Krogh,
 
 4 Conn. App. 117, 123, 492 A.2d 536 (1985). Second, “[p]arties do not ordinarily insert meaningless provisions in their agreements and, therefore, if it is reasonably possible to do so, every provision must be given effect.”
 
 Dainty Rubbish Service, Inc.
 
 v.
 
 Beacon Hill Assn., Inc.,
 
 32 Conn. App. 530, 534, 630 A.2d 115 (1993). Paragraph eleven provides that after January 1, 1969, the restrictions are to continue automatically for ten year periods unless prior to January 1, 1969, or the expiration of the ten year period then in operation “said covenants are terminated . . . by an agreement executed by the then owners of at least fifty-one percent of all of the said parcels . . . .” The use of the phrases “an agreement” and “by the then owners” cannot be disregarded. The word “agreement” is a singular noun which means “the act of agreeing or coming to a mutual arrangement.” Webster’s Third New International Dictionary. The word “an” is used as a function word to suggest a limitation in number, i.e., one. Id. The word “then” means “belonging to the time mentioned ... at that time: at the time mentioned or specified.” Id. As used in paragraph eleven, these words express an intent that there be one agreement or mutual arrangement and that the parties to the agreement be lot owners at the time the agreement is formed. In effect, paragraph eleven gives the power of termination to those who are presently benefiting from the restrictions.
 

 
 *461
 
 The three quitclaim deeds, which were signed over a twenty-two year period, do not constitute an agreement executed by the then owners. By the time the last person signed the third quitclaim deed, the previous signers may no longer have been owners within the subdivision. The evidence does not show otherwise. The persons who signed the deeds did not extinguish the rights of the owners of the other lots to enforce the restrictive covenants.
 

 The second ground on which the plaintiffs seek relief requires this court to determine whether there has been such a change in the area as to defeat the objects and purposes of the restrictive covenants so that they are no longer effective. See
 
 Fidelity Title & Trust Co.
 
 v.
 
 Lomas & Nettleton Co.,
 
 125 Conn. 373, 377, 6 A.2d 700 (1939);
 
 Bickell
 
 v.
 
 Moraio,
 
 supra, 117 Conn. 184. The plaintiffs claim that the commercial development along the Boston Post Road since 1943 is a sufficient change to warrant the removal of the restrictions. The defendants, on the other hand, contend that the change is not sufficient because Lakeview Acres is still a residential area. The plaintiffs focus on the changes outside the subdivision. The defendants focus on the subdivision.
 

 “In the majority of states, changes outside the limits of the tract, even though they do impinge on the border lots, do not justify any relaxation of enforcement of the restrictions within the tract, so long as such enforcement remains beneficial to most of the property in the tract.” 9 R. Powell, supra, § 679 [2], p. 60-143. Connecticut follows the majority rule. The rationale of the rule was explained in
 
 Bickell
 
 v.
 
 Moraio,
 
 supra, 117 Conn. 181-82: “The creation, in a building development scheme, of an area restricted to residential purposes contemplates the continued existence of such an area from which business is excluded. That it also contemplates that business may extend to the confines of the area is apparent since it is to prevent the encroachment
 
 *462
 
 of such business into the protected area that the restrictions are created. Purchasers of lots in such an area buy in reliance upon the fact that all other lots in the area are subject to the same restrictions as those contained in their own deeds, and that the entire development will retain its character as a purely residential district. So long as it remains possible to carry out the original purpose of the development each purchaser of a lot has a right to the protection of his easement in all the other lots in the restricted area . . . .”
 

 The character of Lakeview Acres as a residential area has not been affected by the commercial development along the Boston Post Road outside the subdivision.
 
 [2]
 
 The changes have not defeated the objects and purposes of the restrictive covenants. Lakeview Acres is entirely a residential area. “The fact that the [plaintiffs’] property would be of more value if the restriction were removed is of no consequence. . . . The [plaintiffs] purchased the land with full knowledge that the . . . tract was subject to the restriction; [they] got everything [they] bargained for, and presumably took the restriction into consideration when [they] agreed on the price [they] paid . . . .” (Citation omitted.)
 
 Harris
 
 v.
 
 Pease,
 
 supra, 135 Conn. 541. The plaintiffs have not shown such a change in the restricted area as would justify this court’s declaring the restrictions on the plaintiffs’ land invalid.
 

 This court finds the restrictive covenants to be valid burdens on the plaintiffs’ property. The restrictions may be enforced by any defendant who did not sign one of the three releases or whose predecessor in title did not sign one of the releases. Judgment shall enter for the defendants.
 

 [1]
 

 Paragraph eleven provides: “That the covenants hereinabove set forth shall continue in full force and effect until January 1, 1969, at which time
 
 *457
 
 said covenants shall be automatically extended for successive periods of ten years each, unless said covenants are terminated in whole or part by an agreement executed by the then owners of at least fifty-one percent of all of the said parcels of land, prior to January 1, 1969, or at the expiration of the ten year period then in operation, in which event, provided the agreement shall have been executed and recorded in the Fairfield Land Records in the manner and form then required to convey real estate, said covenants or such of them as are not to be continued, shall terminate and be of no further force or effect on January 1,1969, or if previously extended, in the manner set forth above, upon the termination of said period.”
 

 [2]
 

 At the request of the parties, the court viewed the subdivision and the nearby area of the Boston Post Road. The court’s observations corroborated the evidentiary findings set forth in this opinion.