******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANDERS B. JEPSEN ET AL. *v.* BETH M.
CAMASSAR ET AL.
(AC 39272)

Lavine, Sheldon and Elgo, Js.

*Syllabus*

The plaintiffs, A and C, who owned real property in a subdivision that also
included a deed to an undivided 1/48 interest in a beach that was subject
to certain restrictive covenants, brought this action seeking a declaration
that a 2011 modification to the beach deed was improperly enacted.
Thereafter, C withdrew from the action and B was added as a party
plaintiff. The defendants included numerous individuals and entities
that, at relevant times, owned real property in the subdivision. In 2014,
a modification to the beach deed was signed by a majority of the property
owners in the subdivision and filed on the land records, and A and B
amended their complaint to challenge the propriety of the 2014 modifica-
tion, alleging, inter alia, that it was enacted without providing proper
notice to the owners of the land lots, without conducting a properly
noticed meeting of the owners, and without conducting a written vote
of the owners, as was required by the terms of the beach deed. The
matter was tried to the court, which rendered judgment in favor of the
defendants in part and held, inter alia, that the 2014 modification was
valid and in full force and effect. On the appeal to this court by A and
B, *held*:

1. Although the trial court correctly determined that modification of the
restrictive covenants in the beach deed pertaining to the use of the
beach did not require the unanimous approval of owners of all forty-
eight properties, as § 4 of the beach deed contained a modification
provision pursuant to which those covenants properly could be modified
by the owners of a majority of the properties in the subdivision, that
court improperly determined that other provisions of the beach deed
could be modified through that same process, as the beach deed con-
tained no provision for the modification of anything other than the
restrictive covenants regarding the use of the beach, and, therefore, the
sections of the 2014 modification that purported to modify, inter alia,
how the beach deed itself could be modified were invalid.

2. Contrary to the trial court's conclusion, the process by which the 2014
amendment was enacted did not comport with the plain language of
§ 4 of the beach deed, which required a "majority vote in writing," and
that a majority was to be determined in accordance with the "votes so
counted"; moreover, a proper construction of § 4 of the beach deed
required notice to all property owners of any vote thereon, and because
the record here indicated that several property owners did not receive
notice of the meeting to vote to adopt the 2014 modification and that
although A and B attended the meeting, they endeavored to preserve
their objection to the failure to give proper notice both prior to and
during the meeting, the trial court improperly concluded that A and B
waived their objection to the adequacy of the notice of the meeting.

3. Although the trial court correctly determined that the mere act of securing
signatures on a modification instrument that was recorded on the land
records did not constitute a vote in writing as contemplated by the
beach deed, the record did not contain sufficient evidence to substantiate
the trial court's finding that owners of a majority of properties cast
votes in writing that were in favor of the 2014 modification; the notice
of the vote on the 2014 modification was sent to forty-one of the forty-
eight properties and also contained a proxy ballot on which owners
could cast their written vote, twenty-four owners submitted a written
proxy votes in favor of the 2014 modification, which was less than a
majority of the forty-eight properties, and, thus, the trial court's conclu-
sion that the 2014 modification was valid and in full force and effect
could not stand.

4. The trial court properly rendered judgment in favor of the defendants on
the claim against them alleging slander of title, that court having properly
determined that A and B had failed to satisfy their burden of proof

concerning that claim; A and B did not demonstrate that the defendants, in filing the modifications on the land records, published a false statement because although the 2011 and 2014 modifications may have been improper under the terms of the beach deed, the filing of those modifications on the land records did not constitute the filing of a demonstrably false statement about the title of A and B, the court's finding that the defendants' actions were taken in good faith and with the intention of clarifying appropriate uses of the beach and not to damage A and B was supported by the evidence and testimony, which the court was free to credit, and the record was bereft of evidence that A and B suffered pecuniary loss as a result of the filing of the modifications.

5. The trial court did not abuse its discretion in declining to award attorney's fees to A and B for their defense against certain allegedly frivolous special defenses that were filed by certain of the defendants; although A and B claimed that no evidence at trial was presented to substantiate the special defenses and that they had expended attorney's fees in response thereto, it was within that court's discretion to determine that an award of attorney's fees was not warranted.

Argued January 5—officially released May 1, 2018

*Procedural History*

Action seeking a judgment declaring, inter alia, that a certain modification to a beach deed was null and void, and for other relief, brought to the Superior Court in the judicial district of New London, where the plaintiff Craig Barrila withdrew his complaint and Beth Jepsen was cited in as an additional plaintiff; thereafter, the named plaintiff et al. filed a third amended complaint; subsequently, the matter was tried to the court, *Bates, J.*; judgment in part for the defendants, from which the named plaintiff et al. appealed to this court; thereafter, the court, *Bates J.*, issued an articulation of its decision; subsequently, the court, *Bates J.*, denied the motion for attorney's fees filed by the named plaintiff et al., and the named plaintiff et al. filed an amended appeal. *Reversed in part; judgment directed.*

*Beth A. Steele*, for the appellants (named plaintiff et al.).

*Mark S. Zamarka*, with whom, on the brief, was *Edward B. O'Connell*, for the appellees (named defendant et al.).

*Christine S. Synodi*, for the appellees (defendant Savas S. Synodi et al.).

*Opinion*

ELGO, J. The plaintiffs Anders B. Jepsen and Beth Jepsen appeal from the declaratory judgment rendered by the trial court in this dispute regarding the modification of a beach deed. In this opinion, we address the plaintiffs' claims that the court improperly (1) concluded that the modification in question was properly enacted, (2) concluded that they had not met their burden in establishing slander of title, and (3) declined to render an award of attorney's fees in their favor.[1] We agree with the plaintiffs' first claim and, accordingly, affirm in part and reverse in part the judgment of the trial court.

The relevant facts are gleaned from the court's memorandum of decision and the undisputed evidence in the record before us. The parties are numerous individuals and entities that, at relevant times, owned real property in a subdivision in New London created in 1954 by the Quinnipeag Corporation (subdivision).[2] The subdivision plan filed on the New London land records depicts the location of various residential parcels, as well as a 250 foot strip of beachfront property commonly known as Billard Beach (beach). That area is designated as "beach rights" on the subdivision plan.

Each owner of real property in the subdivision is the holder of two deeds relevant to this dispute: a warranty deed that conveyed ownership rights in fee simple to his or her individual parcel of subdivision property (warranty deed) and a quitclaim deed that conveyed an "undivided one-forty-eighth (1/48th) interest" in the beach (beach deed).[3] This litigation concerns a purported modification of the beach deed.

Section 2 of the beach deed sets forth certain "restrictions on the use" of the beach,[4] known also as restrictive covenants. "A restrictive covenant is a servitude, commonly referred to as a negative easement . . . . A servitude is a legal device that creates a right or an obligation that runs with the land or an interest in land." (Citation omitted; internal quotation marks omitted.) *Grovenburg* v. *Rustle Meadow Associates, LLC*, 174 Conn. App. 18, 25 n.7, 165 A.3d 193 (2017). As the Restatement (Third) of Property, Servitudes notes, "[t]he distinctive character of a servitude is its binding effect for and against successors in interest in the property to which the servitude pertains . . . ." 1 Restatement (Third), Property, Servitudes c.7, introductory note, p. 334 (2000); see also *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 468, 52 A.3d 702 (2012) (concluding that "the burdens of the covenants at issue . . . [could] run with the land" because "the covenants were formally created as part of a transfer of land; they explicitly provide that they are 'binding upon the [g]rantee, its successors and assigns, shall inure to the benefit of the [g]rantor, its successors and assigns, and

shall run with the land'; and they appear on their face to relate to the land and not to impose any conceivable burden on the initial grantee independent of its ownership of the land"); *Bauby* v. *Krasow*, 107 Conn. 109, 112, 139 A. 508 (1927) ("[i]f [a restrictive covenant] runs with the land, it binds the owner"); *Olmstead* v. *Brush*, 27 Conn. 530, 536 (1858) ("if the grantee accepts the deed he assents to the [restrictive covenant] in it"). It is undisputed that all owners of property in the subdivision are bound by the restrictive covenants contained in the beach deed.[5]

Section 4 of the beach deed expressly provides a mechanism for the modification of the restrictive covenants contained in § 2 of the beach deed. It states: "That the restrictions on the use of the [beach] contained in [§] 2 hereof may be modified by a majority vote in writing of the owners of the premises conveyed. Each owner, (or in the case of joint ownership or ownership in co-tenancy, such joint owners or owners in co-tenancy together) shall be entitled upon any such vote to such number of votes as the numerator of their fractional interest in the premises conveyed, and upon any such vote, the majority shall be determined according to the sum of the votes so counted."

For more than one-half century, owners of property in the subdivision enjoyed the use of the beach without incident. That changed after Craig Barrila moved into the subdivision in 2008. As the court found, "[i]n 2008, [Barrila] purchased 755 Pequot Avenue, one of the forty-eight residential lots in [the subdivision], and although, as he testified, he did not personally use the beach, he allowed his girlfriend and her three children to swim, hold campfires and party at the beach. . . . Barrila testified that initially no one objected to this conduct. However, he stated that in July, 2011 . . . he received a telephone call from a representative of the [Billard Beach Association (association)][6] stating that these individuals could not use the beach without his being present. . . . Prior to the telephone call to Barrila, testimony and evidence received at trial does not indicate any significant concern being expressed about the use of or conduct on the beach by members of the [subdivision].

"In reaction to the use of the beach allowed by Barrila and what was perceived to be a lack of clarity in the deeds and [the association's] bylaws regarding allowable use of the beach, a group of residents including Garon Camassar,[7] an attorney and husband of defendant Beth M. Camassar, in the summer of 2011, began to circulate a petition for a 'Modification of Covenants and Restrictions re Billard Beach, New London, Connecticut.' This modification (2011 modification)— which all parties now agree is of no force or effect— purported to supersede all covenants and restrictions contained in the [beach deed]." (Footnotes added.)

The 2011 modification purported to revise the beach deed in three significant respects. First, it sought to modify the restrictive covenants governing the use of the beach contained in § 2 of the beach deed. Second, it revised the modification provision contained in § 4 of the beach deed to require the approval of 75 percent of owners instead of a simple majority. Third, the 2011 modification added a new section regarding the enforcement of the beach deed, which provided for an award of compensatory damages, punitive damages, costs and attorney's fees.[8]

After learning of the 2011 modification proposal, Barrila sent an e-mail to approximately fifty e-mail addresses, the subject of which was "Proposed Changes to Billard Beach Land Deed." In that September 24, 2011 e-mail, Barrila indicated that he had been provided a copy of the 2011 modification earlier that day. He then stated that "there is an effort underway to collect a majority of signatures to support a modification to our current [beach] deed. . . . I have reviewed the proposed document today and have some substantial concerns. . . . I want to reiterate that these are not the beach rules (which are guidelines). These are legally binding and enforceable changes to our current [beach] deed which will impact your future ability to convey your asset. . . . I'm willing to support whatever the majority of my neighbors believe to be fair regarding the rules. However, I want to ensure that appropriate process is followed to effect any proposed changes. . . ."

The very next day, Ronald E. Beausoleil replied to Barrila by e-mail and offered to meet privately with him and Garon Camassar. Beausoleil at that time was a member of the executive committee of the association[9] and had collected signatures on the 2011 modification with Garon Camassar. Barrila responded to that e-mail hours later, stating that "[w]ith all due respect the time for private meetings has passed. I'm advocating [for] a public meeting with all interested/impacted parties involved." Later that night, Barrila's attorney contacted Garon Camassar, who had drafted the 2011 modification and had solicited signatures thereon. In an e-mail sent on the evening of September 25, 2011, Attorney Michael W. Sheehan reiterated Barrilla's concerns and asked "that nothing be implemented or recorded on the land records until all owners have been notified and been given the opportunity to meet and be heard." Despite that request, no meeting or vote of the owners transpired. Instead, the 2011 modification was filed on the New London land records the next morning.

On September 27, 2011, defendant Hope H. Firestone, a signatory to the 2011 modification acting in her capacity as president of the association, sent a letter to owners of property within the subdivision on association letterhead. That letter began by stating, "Good News!!

As of Monday morning September 26, 2011, the restrictive provisions of the original beach deed have been modified." Firestone then provided an overview of the principal changes contained in the 2011 modification.

In its memorandum of decision, the court found that "contrary to the requirements of the beach deed, no formal 'vote' was ever noticed or taken on the [2011] modification; rather, the circulators assumed that once they had obtained the signatures of a majority of lot owners, the deed was recordable. . . . [A] 'vote' requires more formality than just obtaining signatures. Black's Law Dictionary 10th Ed. (2009), defines a vote as '[t]he expression of one's preferences or opinion in a meeting or election by ballot, show of hands, or other type of communication.' Accordingly, the [2011] modification appears to have been a legal nullity."[10] No party has challenged the propriety of that determination in this appeal.

After the 2011 modification was filed on the New London land records, Anders B. Jepsen and Barrila commenced this declaratory action.[11] Their original complaint sought to have the 2011 modification declared null and void. They alleged, inter alia, that the 2011 modification "was enacted without the knowledge or consent of the plaintiffs"; that it "was enacted without a full and fair opportunity to have a meaningful discussion between the owners [in the subdivision] and to voice opinion as to the merits of the [m]odification"; and that "the contents and meaning of the [m]odification was misrepresented to one or more of the signers . . . and to others who were not given an opportunity to review the [m]odification prior to its enactment."

As the court found in its memorandum of decision, "[i]n response to the suit, the parties engaged in prolonged discussions, including mediation, seeking to resolve the issues raised in the legal action, while still trying to respond to the concerns of the [a]ssociation members regarding uncontrolled use of the beach. . . . In the course of these negotiations, the proponents of the modification, working with the Executive Committee of the Association, developed and proposed the 'Amended and Restated Covenants and Restrictions Regarding Billard Beach, New London, Connecticut' " (2014 modification).[12] The 2014 modification contained an extensive revision of the restrictive covenants governing the use of the beach.[13] It removed the 75 percent super majority requirement imposed in the 2011 modification proposal, stating in relevant part that the restrictive covenants in the beach deed "may be modified by a written vote of a majority of the [r]esidential [l]ot [o]wners . . . ."[14] The 2014 modification also eliminated the enforcement provisions set forth in § 7 of the 2011 modification. See footnote 8 of this opinion.

On October 3, 2014, defendant Anne Marie Lizarralde, who at that time served as the secretary of the associa-

tion, sent an e-mail to forty-one of the forty-eight owners within the subdivision notifying them that the association's annual meeting would be held on October 10, 2014.[15] In that correspondence, Lizarralde stated: "Billard Beach Members—The annual [association] meeting has been scheduled for Friday, October 10th at 7 p.m. in the New London Senior Center (120 Broad Street). Please find attached four documents to read carefully. If you are unable to open any of them, please let us know and we'd be happy to put a hard copy in the mail to you. If you are unable to attend, please fill out the proxy and get it back to us as soon as possible so that you are represented. You can either e-mail back the proxy to [Lizarralde] or drop it off at any of the board members' homes. . . ." (Emphasis in original.)

Appended to that e-mail were four documents. The first was a copy of the 2014 modification. The second document was titled "BILLARD BEACH ASSOCIATION BALLOT OR PROXY" and purportedly permitted owners within the subdivision to vote by proxy on the 2014 modification.[16] The third document, titled "BILLARD BEACH ASSOCIATION NOTICE OF ANNUAL MEETING," was an agenda that set forth five items for business, including the "vote upon" the 2014 modification.[17] The fourth and final document was a letter addressed to "Billard Beach property owner" from the "Billard Beach Association Board," which provided an overview of the revisions contained in the 2014 modification. That letter indicated that "[t]his version of the [c]ovenants was conceived and drawn as a final document, not subject to revision . . . ."

Two days later, on October 5, 2014, Beth Jepsen replied to Lizarralde and all parties copied on Lizarralde's October 3, 2014 e-mail. In that communication, Jepsen stated in relevant part that the plaintiffs "object to both your improper Annual Meeting notice and to the [2014 modification] contained within it." After noting that "[i]t would take far too long to cover each issue with [respect to] both the 'notice' provided or the new [2014 modification] in a single e-mail," Jepsen stated that "there are too many issues and much of the legal language may be overly complicated for a . . . late night association meeting with other topics on the agenda." She thus requested "open discussion with the owners . . . over a reasonable amount of time with proper notice . . . in a much more respectful manner going forward."

The executive committee of the association held a meeting on the eve of the annual meeting on October 9, 2014. The minutes of that meeting, which were admitted into evidence, indicate that the committee had a "discussion about the annual meeting that will take place tomorrow," at which a vote would be held on the 2014 modification. With respect to that vote, the minutes state that "[o]nly property owners should be allowed

to speak" and "[t]he plan will be to leave the vote open after the meeting for several weeks so that it will give those who are unable to attend the time to vote."

The association's annual meeting was called to order at 7:04 p.m. on October 10, 2014. The record indicates that the owners of fewer than half of the forty-eight properties in the subdivision attended that meeting.[18] It is undisputed that, prior to the commencement of that meeting, several of the "ballot or proxy" forms contained in Lizarralde's October 3, 2014 notice were submitted to the association either electronically or in person that night. The first item of association business discussed during the meeting, which had been designated as item "b" on the association's agenda; see footnote 17 of this opinion; was the 2014 modification. As the court noted in its decision, defendant Robert McLaughlin, Jr., who was the president of the association at that time, began the discussion by stating that the executive committee had agreed to hold open the time for collection of the proxy votes until November 1, 2014.

The court found, and the testimony at trial reflects, that "[t]he meeting became quite contentious." In particular, the court found that, when Beth Jepsen was speaking, some attendees interrupted her and attempted to cut her off. The official minutes of the association meeting, which were admitted into evidence at trial, likewise state that "[s]everal people made rude comments that, in part, caused [the plaintiffs] to leave." Those minutes state that McLaughlin then "attempted to regroup" and "again mentioned that the vote [on the 2014 modification] would remain open until November 1st." At that time, defendant Eric Parnes made a motion "to move on with the rest of the annual meeting agenda," which was approved. Other association business then was conducted. Lizarralde and McLaughlin both testified at trial that, at the conclusion of the October 10, 2014 meeting, a majority of owners of the forty-eight properties in the subdivision had not cast votes in favor of the 2014 modification, as required by § 4 of the beach deed.

The record likewise indicates, and the parties do not dispute, that owners of a majority of the forty-eight properties had not voted in favor of the 2014 modification by the November 1, 2014 deadline announced at the association's October 10, 2014 annual meeting. As the court found, "[t]wenty-two votes in favor of the [2014] modification—not a majority of all lot owners—were officially received by November 1 . . . ." The record nonetheless indicates that Lizarralde, on November 6, 2014, sent an e-mail to owners of fewer than thirty properties in the subdivision that stated in relevant part: "Many thanks to everyone who voted yes to amend the [beach deed]. We received a majority of yes votes and so . . . we now need to have each of you sign the

official document that will be notarized. . . ."[19] In her testimony at trial, Lizarralde admitted that, at the time that she sent that e-mail, owners of a majority of the forty-eight properties had not submitted written votes in favor of the 2014 modification.

Prior to trial, the plaintiffs served a request for production on the defendants, in which they sought, inter alia, "[c]opies of all proxies submitted in conjunction with the 2014 Deed Modification." The defendants complied with that request, and produced copies of twenty-six proxy votes, which were admitted into evidence at trial. A total of twenty-four proxies contain votes in favor of the 2014 modification, less than a majority of the forty-eight properties in the subdivision.[20]

On December 23, 2014, the 2014 modification was filed on the New London land records. That instrument contained the signatures of owners of twenty-nine properties within the subdivision,[21] including several who did not attend the October 10, 2014 annual meeting and did not at any time submit a proxy vote.[22] The plaintiffs thereafter amended their complaint to challenge the validity of that enactment. Specifically, they sought a declaratory judgment that the 2014 modification "be declared null and void" for multiple reasons, including that it "was enacted without providing proper notice to the owners of the land lots . . . without conducting a properly noticed meeting of the owners, without allowing for ample prior discussion or comment by the owners . . . and without conducting a written vote of the owners. . . ."

A trial was held over the course of four days in December, 2015. The plaintiffs called nineteen witnesses and submitted sixty documents that were admitted into evidence. The defendants submitted three exhibits, which were duplicative of documents already in evidence, but otherwise presented no documentary or testimonial evidence.[23] At the conclusion of trial, the parties, at the behest of the court, submitted posttrial briefs that outlined their respective positions on the issues presented at trial. In their brief, the plaintiffs argued, among other things, that "the 2014 modification [is] invalid because it was not properly noticed,[24] did not receive the requisite number of votes and was not executed pursuant to proper procedure."[25] (Footnote added.) In response, the defendants argued in their posttrial brief that "[t]he Beach Deed does not require notice, a meeting, or discussion or comment of any kind in order to modify its terms." The defendants further claimed that the act of signing the 2014 modification qualified as the written vote of the owners.

In its memorandum of decision, the court ruled in favor of the defendants on the slander of title counts of the operative complaint, finding that the plaintiffs had not demonstrated the existence of either a false statement, malice on the part of the defendants, or

pecuniary loss to the plaintiffs. With respect to the plaintiffs' challenge to the 2011 modification, the court noted that the defendants at trial had conceded that it was "of no force or effect . . . ." The court then explained that "contrary to the requirements of the beach deed, no formal 'vote' was ever noticed or taken on the [2011] modification; rather, the circulators assumed that once they had obtained the signatures of a majority of lot owners, the deed was recordable." The court flatly rejected that proposition, stating that "a 'vote' requires more formality than just obtaining signatures." The court thus rendered judgment in favor of the plaintiffs on the first count of their complaint, declaring that "[t]he 2011 modification by agreement of the parties is deemed null and void."

With respect to the 2014 modification, the court disagreed with the plaintiffs' claim that the beach deed could not be "altered without unanimous approval of all owners of the subdivided lots." The court also rejected the plaintiffs' claims that both the notice of the vote on the 2014 modification and the vote itself were improper. The court noted that, unlike the enactment of the 2011 modification, "a formal 'vote' was noticed and conducted prior to recording" the 2014 modification. The court emphasized, consistent with the stipulation of the parties; see footnote 3 of this opinion; that the association was a voluntary association that had no authority over owners within the subdivision, and further found that "the portion of the [October 10, 2014 association] meeting dedicated to the beach use was not considered by any party to be an official meeting of the association." Nevertheless, with respect to the "general standards of due process" that it deemed applicable to the modification process, the court stated that the association was "not held to the same 'due process' standards as a governmental authority" and concluded that no impropriety transpired with respect thereto.

Although a majority of owners had not voted in favor of the 2014 modification by the November 1, 2014 deadline, the court found that "seven more votes in favor, either in the form of proxies or signed documents, were received and accepted in the weeks thereafter, representing twenty-nine of the forty-eight properties—a majority."[26] The court also found that the plaintiffs waived their right to object to any deficiency in the notice provided by Lizarralde's October 3, 2014 e-mail notice "as a result of their awareness [of] and participation" in the meeting. Accordingly, the court rendered judgment in favor of the defendants on the fourth count of the operative complaint, stating that "[t]he 2014 modification is declared valid and in full force and effect."[27]

I

The principal contention advanced by the plaintiffs is that the 2014 modification was improperly enacted.

Specifically, they claim that the court improperly determined that (A) modification of the beach deed did not require the unanimous approval of all owners within the subdivision and (B) the 2014 modification was enacted in accordance with the strictures set forth in the beach deed. We address each claim in turn.

A

We first consider the claim that modification of the beach deed requires the unanimous approval of all lot owners within the subdivision. In support of that proposition, the plaintiffs rely on this court's decision in *Mannweiler* v. *LaFlamme*, 46 Conn. App. 525, 700 A.2d 57, cert. denied, 243 Conn. 934, 702 A.2d 641 (1997). In *Mannweiler*, this court held that "when, as here, the owner of a tract of land sells lots with restrictive covenants . . . and does not retain the right to rescind or amend them and *does not provide a method for terminating or amending them*, [the owner] has no right to do so without the consent of *all* the then property (lot) owners." (Emphasis added.) Id., 542. Accordingly, when no provision for the modification of a restrictive covenant is contained in the operative instrument filed on the land records, *Mannweiler* instructs that such modification may only be accomplished through the unanimous approval of all property owners. That precept comports with the position adopted by the Restatement (Third) of Property, Servitudes, which recognizes that "[a] servitude may be modified . . . by agreement of the parties [or] pursuant to its terms . . . ." 2 Restatement (Third), supra, § 7.1, p. 337. As a general matter, the Restatement notes that "[w]here *all* of the parties interested in a servitude agree, they are free to modify" the servitude. (Emphasis added.) Id., comment (b), p. 339. The Restatement further indicates that "[t]he terms of a servitude may include a provision that permits modification . . . without the consent of all the parties. . . . [A] modification . . . pursuant to such a provision is generally effective." Id., comment (c), p. 340. Absent such an express provision, "[a] modification agreed to by some but not all of the parties is not effective . . . ." Id.; accord 9 Powell on Real Property (M. Wolf ed., 2000) § 60.08, pp. 112–13 (noting that "absent express provisions to the contrary, amendments may only be effected by all of the owners of property burdened by the covenants" and observing that "[c]ovenants can also be modified . . . where the covenants permit modification . . . by a specified percentage of lot owners").

It is undisputed that the beach deed in the present case contains a modification provision, which requires the written approval of the owners of a majority of the forty-eight properties in the subdivision to modify "the restrictions on the use of the [beach]" set forth in § 2.[28] Because a method for amending the restrictive covenants contained in § 2 is expressly provided for in the

beach deed, those covenants properly could be modified by the owners of a majority of the properties in the subdivision. For that reason, the trial court correctly concluded that modification of those restrictive covenants does not require the unanimous approval of owners of all forty-eight properties.[29]

At the same time, it is undisputed that §§ 7 through 12 of the 2014 modification amended various provisions of the beach deed other than the "restrictions on use of" the beach contained in § 2 thereof, including the manner by which the beach deed itself may be modified.[30] Yet the beach deed contains no provision for the modification of anything other than the restrictive covenants regarding "the use of" the beach. Because no such provision exists in the beach deed, the modification of anything other than the restrictive covenants contained in § 2 of the beach deed required the unanimous approval of all property owners in the subdivision. *Mannweiler* v. *LaFlamme*, supra, 46 Conn. App. 542. The modifications contained in §§ 7 through 12 of the 2014 modification, therefore, are invalid. The court improperly concluded otherwise in its memorandum of decision.

B

The plaintiffs also challenge the process by which the 2014 modification was enacted. More specifically, they maintain that the court improperly concluded that adequate notice was provided to the owners of subdivision properties, that a formal vote was properly conducted in accordance with § 4 of the beach deed, and that signatures on the 2014 modification by owners that otherwise did not attend the October 10, 2014 meeting or submit a written vote or proxy nevertheless constituted proper votes, as required by the beach deed.[31] Those claims require us to construe § 4 of the beach deed, which governs the modification of the restrictive covenants at issue.

"The principles governing our construction of conveyance instruments are well established. In construing a deed, a court must consider the language and terms of the instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed or other conveyance, and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence. . . . The construction of a deed in order to ascertain the intent expressed in the deed presents a question of law and requires consideration of all its relevant provisions in the light of the surrounding circumstances."[32] (Internal quotation marks omitted.) *Il Giar-*

*dino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 510–11, 757 A.2d 1103 (2000).

In articulating those principles of construction, our Supreme Court has expressly "adopted the position" set forth in the Restatement (Third), Property, Servitudes § 4.1.[33] *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 636, 866 A.2d 588 (2005). The commentary to § 4.1 specifically addresses the interpretation of expressly created servitudes, such as those contained in the beach deed. With respect to such expressly created servitudes, the Restatement notes that "[t]he fact that servitudes are intended to bind successors to interests in the land, as well as the contracting parties, and are generally intended to last for an indefinite period of time, lends increased importance to the writing because it is often the primary source of information available to a prospective purchaser of the land. The language [in a deed] should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved. Searching for a particular meaning adopted by the creating parties is generally inappropriate because the creating parties intended to bind and benefit successors for whom the written record will provide the primary evidence of the servitude's meaning." 1 Restatement (Third), supra, § 4.1, comment (d), pp. 499–500; accord *Dent* v. *Lovejoy*, 85 Conn. App. 455, 463–64, 857 A.2d 952 (2004) (adhering to that standard of construction), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

We begin, therefore, with the language of the deed. Section 4 of the beach deed provides: "That the restrictions on the use of the [beach] contained in [§] 2 hereof may be modified by a majority vote in writing of the owners of the premises conveyed. Each owner, (or in the case of joint ownership or ownership in co-tenancy, such joint owners or owners in co-tenancy together) shall be entitled upon any such vote to such number of votes as the numerator of their fractional interest in the premises conveyed, and upon any such vote, the majority shall be determined according to the sum of the votes so counted."[34] The first sentence of that section sets forth three requirements for the modification of the restrictions on the use of the beach: (1) there must be "a majority vote"; (2) that vote must be expressed "in writing"; and (3) that vote must be among "the owners" of the properties in the subdivision.

The second sentence in § 4 of the beach deed clarifies the nature of "any such vote" conducted pursuant thereto. That sentence memorializes the fact that, when a vote on a proposed modification transpires, the property owners in the subdivision are "entitled upon any such vote" to cast votes in proportion to their fractional interest in the beach. That sentence then concludes by instructing that "upon any such vote, the majority shall

be determined according to the sum of the votes so counted."

In its memorandum of decision, the trial court concluded that the vote contemplated by § 4 of the beach deed "requires more formality than just obtaining signatures." We agree. The plain language of § 4 not only requires a "majority vote in writing," but twice qualifies that imperative with modifiers that are implicated "upon any such vote."[35] The plain language of § 4 also mandates that the issue of whether a "majority" has been secured in favor of any proposed modification is to be determined in accordance with "the *votes* so counted." (Emphasis added.) In this regard, we are mindful that every word and phrase of a deed is presumed to have meaning, and must be construed in a manner that does not render it superfluous. *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, 62 Conn. App. 551, 557, 771 A.2d 260, cert. denied, 256 Conn. 917, 773 A.2d 943 (2001). The use of the plural "votes" in the concluding sentence of § 4 to determine whether a "majority" has been secured is strong evidence of an intent to establish a two-step modification process. Under the first step of that modification process, which involves a vote "in writing of the owners of the premises conveyed," all owners of a fractional interest in the beach possess the right to participate in any such vote. Pursuant to the plain language of the concluding sentence clause of § 4, "upon any such vote," the "votes" of those owners then are "counted," from which it "shall be determined" whether owners of a "majority" of the properties in the subdivision favor the proposed modification.

That construction is one which we believe an ordinary purchaser of property in the subdivision would ascribe to it in the context of the parcels of land involved. See *Dent* v. *Lovejoy*, supra, 85 Conn. App. 463. In this respect, we note the particular situation of the parties and the circumstances surrounding the enactment of the beach deed. The record reflects that the beach was an integral part of the subdivision when it was created in 1954. Each property is allocated an "undivided one-forty-eighth (1/48th) interest" in the beach, as memorialized in the beach deed. The subdivision plan filed on the New London land records describes the beach area as one subject to "beach rights." Moreover, the restrictive covenants contained in the beach deed are uniform covenants enacted by a grantor that divided its property into building lots under a general development scheme. Under Connecticut law, purchasers of those lots are presumed to have "paid a premium for the property in reliance upon the uniform development plan being carried out." *Mannweiler* v. *LaFlamme*, supra, 46 Conn. App. 536; see also *Leabo* v. *Leninski*, 182 Conn. 611, 615, 438 A.2d 1153 (1981) (noting that beach easements "enhance the value of the property and that such enhancement was implied by

the subdivision's character as a waterfront development"). As the Restatement recognizes, "the consideration paid for the servitude" is a proper consideration in the construction of expressly created servitudes. 1 Restatement (Third), supra, § 4.1, comment (d), p. 499. The servitudes at issue in this case secured the right of property owners to "use and have access to" the beach. To paraphrase our Supreme Court, those servitudes constitute a "property right which the parties to the original conveyance voluntarily created, which was and is of substantial benefit to the [property owners], and for which [they] paid."[36] *Harris* v. *Pease*, 135 Conn. 535, 541, 66 A.2d 590 (1949).[37] Both the magnitude of that right and the context in which it arose inform our construction of § 4 of the beach deed, and further explain why that modification provision memorializes the right of all owners of a fractional interest in the beach to cast a vote on any proposed modification.

In that vein, we emphasize that the present dispute does not involve a trivial dispute between neighbors. This case concerns the modification, and possible restriction, of an owner's right to use the beach. The law presumes that owners purchased their properties in this beachfront subdivision in reliance on the use rights memorialized in § 2 of the beach deed. *Mannweiler* v. *LaFlamme*, supra, 46 Conn. App. 536. Although that deed includes a mechanism for the modification of those use rights, we are convinced that purchasers in the subdivision would read those provisions, which mandate both a "vote in writing of the owners of the premises conveyed" and a determination of "the majority" view on any proposed modification based on "the sum of the votes so counted," as requiring a formal vote, at which each owner of a fractional interest in the beach has the opportunity to cast a vote.[38] As the trial court rightly concluded in its construction of the beach deed, the mere act of collecting signatures on a written document does not suffice.

The particular language employed in § 4 of the beach deed distinguishes this case from others in which the deed specifically provided that modification may be accomplished by the mere filing of a written instrument on the land records. See, e.g., *Cappello* v. *Ciresi*, 44 Conn. Supp. 451, 455, 691 A.2d 42 (1996) ("[p]aragraph eleven of the [deed] provides that the restrictive covenants may be terminated . . . at the end of certain periods by an agreement executed by at least 51 percent of the then owners of the parcels of land, provided the agreement is recorded in the land records"), aff'd, 44 Conn. App. 587, 689 A.2d 1169 (1997); *Armbrust* v. *Golden*, 594 So. 2d 64, 65 (Ala. 1992) (modification provision stated in relevant part that "[t]hese restrictions shall continue in full force . . . unless the then owners of a majority of the lots affected hereby sign a written agreement terminating these restrictions, and put such written termination on record in the Office of the Judge

of Probate of the County where the property is situated"); *Miller* v. *Sandvick*, 921 S.W.2d 517, 519–20 (Tex. App. 1996, writ. denied) (modification provision stated in relevant part that restrictive covenants "may be amended at any time by an instrument signed by two-thirds . . . of the then owners . . . and such instrument is recorded in the office of the County Clerk"). Unlike those cases, the deed here contains no provision for modification by the filing of a written instrument on the land records. Rather, § 4 plainly contemplates a vote of subdivision property owners, with the "votes so counted" determinative of whether a majority has been obtained.

Although the proponents of the 2014 modification, now defendants in this action, maintain that the simple act of signing the 2014 modification qualifies as "the written vote" of the owners, the trial court rejected that claim, as do we. As the court aptly noted, the modification procedure outlined in § 4 of the beach deed "requires more formality than just obtaining signatures." The defendants' construction is contrary to both the plain language of § 4 of the beach deed and the meaning that an ordinary purchaser would ascribe to it, given the purchaser's significant property interest in the use of the beach.[39] See *Harris* v. *Pease*, supra, 135 Conn. 541.

In its memorandum of decision, the court found that the 2011 modification was invalid because "no formal 'vote' was ever noticed or taken," which conclusion is consistent with our construction of § 4 of the beach deed.[40] The court distinguished that 2011 enactment from the 2014 modification, stating in relevant part that "[u]nlike the process of approving and recording the [2011 modification], a formal 'vote' was noticed and conducted prior to recording of the [2014] modification." Accordingly, the court declared the 2014 modification "valid and in full force and effect." That determination is problematic in two respects.

1

First, the court found, and the parties do not dispute, that notice of the vote on the 2014 modification was *not* provided to all property owners. See footnote 15 of this opinion.[41] As we previously have discussed, § 4 of the beach deed affords owners of a fractional interest in the beach the right to cast a vote on any proposed modification to the restrictions on its use. As the defendants concede in their appellate brief, "each owner is entitled to one vote . . . ." It is axiomatic that the right to vote is meaningless without notice that a vote is being held. See, e.g., *Walgren* v. *Board of Selectmen*, 373 F. Supp. 624, 635 (D. Mass. 1974) ("in view of the importance of the right to vote" it was "inconceivable" that notice would not be required), aff'd, 519 F.2d 1364 (1st Cir. 1975); *Graham* v. *State Officers Electoral Board*, 269 Ill. App. 3d 609, 612, 646 N.E.2d 1357 (1995)

("[n]otice is the most basic prerequisite to ensure the right to vote"). For that reason, we disagree with the defendants that notice of the vote on a proposed modification of the beach deed is not required pursuant to § 4.

Indeed, § 4.1 (2) of the Restatement (Third) of Property, Servitudes, provides in relevant part that "a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred." 1 Restatement (Third), supra, § 4.1 (2), p. 497. Connecticut's "strong public policy favoring the protection of private property rights"; *Ace Equipment Sales, Inc.* v. *Buccino*, 273 Conn. 217, 232 n.11, 869 A.2d 626 (2005); coupled with the fact that the beach deed expressly provides for a vote of the property owners on any proposed modification to the restrictive covenants governing their use of that private property, convinces us that the proper construction of § 4 of the beach deed requires notice to property owners of any vote thereon, as the trial court concluded.[42]

At trial, the defendants maintained that the plaintiffs waived any objection to the adequacy of the notice through their attendance at and participation in the October 10, 2014 association meeting, relying primarily on *Schwartz* v. *Hamden*, 168 Conn. 8, 357 A.2d 488 (1975). In its memorandum of decision, the court agreed with the defendants, citing *Schwartz*. That precedent, however, is readily distinguishable from the present case. *Schwartz* involved a public hearing of a planning and zoning commission, at which certain plaintiffs appeared through counsel. Id., 14. Our Supreme Court emphasized that although notice by mail had not been provided to those plaintiffs, they "waived their right to object to that omission when they appeared without objection at the hearing." Id., 15.

That context is plainly distinguishable from this case, which does not involve a public hearing on proposed zoning action but, rather, a vote on proposed modifications to the plaintiffs' deed to the beach and corresponding use rights. Those rights are memorialized in restrictive covenants, in which the plaintiffs here possess a property interest. *Harris* v. *Pease*, supra, 135 Conn. 541. Interested members of the public may attend a zoning hearing, and participate in the public comment portion thereof, but they are not entitled to cast votes on the proposed zoning action. By contrast, the beach deed's modification provision expressly vests in owners of a fractional interest in the beach the right to vote on proposed modifications to the restrictions on its use.

*Schwartz* also is inapposite on a factual level, as the plaintiffs here did not appear at the October 10, 2014 meeting without objection.[43] As Beth Jepsen stated in her October 5, 2014 response to Lizarralde's notice of the vote on the 2014 modification, the plaintiffs "object to both your improper Annual Meeting notice and to the

[2014 modification] contained within it." Beth Jepsen reiterated those objections during her comments at the October 10, 2014 meeting. *Schwartz*, therefore, is both contextually and factually inapplicable to the present case. Far from intentionally relinquishing their objections to the October 10, 2014 proceeding, the record demonstrates that the plaintiffs endeavored to preserve those objections both prior to and during that proceeding.

The court, therefore, improperly concluded that the plaintiffs waived their objection to the adequacy of Lizarralde's October 3, 2014 notice. In light of the undisputed fact that notice of the vote on the 2014 modification was not provided to all property owners in the subdivision, we agree with the plaintiffs that the enactment of the 2014 modification did not comport with § 4 of the beach deed.[44]

2

We already have determined that the court properly concluded that the mere act of securing signatures on a modification instrument does not constitute the "vote in writing" contemplated by § 4 of the beach deed. In its decision, the court also determined that, unlike the 2011 modification, the 2014 modification was the product of a formal vote. Section 4 of the beach deed requires a "vote in writing of the owners" on any proposed modification to the restrictive covenants governing the use of the beach. Section 4 further mandates that the determination of whether a majority has been secured "shall be determined according to the sum of the votes so counted." The question, then, is whether the record contains evidence to substantiate the court's finding that owners of a majority of the properties cast votes in writing that were in favor of the 2014 modification.

In its memorandum of decision, the court found that a formal vote on the 2014 modification was scheduled for, and conducted at, the association's October 10, 2014 annual meeting. As the court found, Lizarralde provided notice of that vote to owners of forty-one properties. That notice, which was admitted into evidence at trial, included (1) a copy of the 2014 modification; (2) the October 10, 2014 meeting agenda, on which "[t]o vote upon the [2014 modification]" was the second item of business; and (3) a form titled "BILLARD BEACH ASSOCIATION BALLOT OR PROXY" on which owners could cast their written vote on the 2014 modification. See footnotes 16 and 17 of this opinion. The testimonial and documentary evidence in the record, including the minutes of the October 10, 2014 meeting[45] and Lizarralde's November 6, 2014 e-mail,[46] substantiates the court's finding that a formal vote on the 2014 modification transpired. The record indicates that several owners submitted written proxy votes at the October 10, 2014 meeting, while others submitted theirs in the ensuing weeks.

It is undisputed that a total of twenty-six proxy votes[47] were submitted by owners of properties in the subdivision, twenty-four of which were in favor of the 2014 modification—less than a majority of the forty-eight properties in the subdivision.[48] The record contains no other written votes on the 2014 modification.

When a vote is held on a proposed modification of the restrictive covenants governing the use of the beach, § 4 of the beach deed plainly provides that the issue of whether a "majority" has been secured in favor of any such proposal "shall be determined according to the sum of the votes so counted." The court found, and the record indicates, that a formal vote on the 2014 modification was held at the October 10, 2014 annual meeting, and that written votes were received at that time and in the weeks thereafter. Most significantly, the record before us indicates that only twenty-four written votes ultimately were submitted in support of the 2014 modification. The court, therefore, improperly determined that the formal vote on the 2014 modification was approved by owners of a majority of properties in the subdivision. Accordingly, its declaration that the 2014 modification is "valid and in full force and effect" cannot stand.[49]

II

The plaintiffs also claim that the court improperly concluded that the plaintiffs had not met their burden in establishing slander of title. We disagree.

"A cause of action for slander of title consists of the uttering or publication of a false statement derogatory to the plaintiff's title, with malice, causing special damages as a result of diminished value of the plaintiff's property in the eyes of third parties. The publication must be false, and the plaintiff must have an estate or interest in the property slandered. Pecuniary damages must be shown in order to prevail on such a claim." (Internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 669–70, 778 A.2d 237 (2001).

For three reasons, we agree with the court's determination that the plaintiffs did not satisfy their burden to establish slander of title. First, they have not demonstrated that the defendants, in filing the modifications on the land records, published a false statement. There is no suggestion that the substance of those written instruments was anything other than an accurate statement of their content—namely, that the signatories thereto wished to amend the beach deed in various respects. As the defendants concede in their appellate brief, those modifications may have been improper under the terms of the beach deed, as we have concluded in part I of this opinion, but they do not contain any demonstrably false statements about the plaintiffs' title.

Second, the court's finding that the defendants did not act with the requisite malice is supported by the evidence in the record before us. The court found that the modifications were enacted in response to a concern "about having the beach open to numerous unknown individuals and thus exposing the owners to possible tort claims in the event of accidents and injuries" and that "all disputed actions [by the defendants] were taken in good faith . . . with the intention of clarifying appropriate uses of the beach and protecting [owners] from potential liabilities . . . ." Testimony at trial by various signatories to the 2011 and 2014 modifications substantiates those findings.[50] In addition, the court heard testimony indicating that the 2011 and 2014 modifications were enacted without any malice toward the plaintiffs. At trial, McLaughlin testified that those modifications were crafted to "protect ourselves" and emphasized that "[i]t was no malice toward anyone, it was just that we were concerned" about liability for activities on the beach. Like others, Firestone in her testimony confirmed that the events that led to the enactment of those modifications had "absolutely nothing to do" with the plaintiffs. "[I]t is well established that the evaluation of a witness' testimony and credibility are wholly within the province of the trier of fact. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *CHFA–Small Properties, Inc.* v. *Elazazy*, 157 Conn. App. 1, 21, 116 A.3d 814 (2015). The court, as trier of fact, was free to credit that testimony, which supports its conclusion that the plaintiffs had not established malice on the part of the defendants.

Third, the record is bereft of evidence that the plaintiffs suffered pecuniary loss as a result of the filing of the 2011 and 2014 modifications on the land records. At trial, Beth Jepsen testified that she believed that the filing of those modifications created a cloud on their title that made their property less marketable. It nevertheless remains that "a clouded title, alone, does not constitute damages per se. Rather, a plaintiff must present evidence of how the clouded title resulted in some pecuniary loss." *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 673, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005). Like the plaintiffs in *Gilbert*, the plaintiffs here "did not present evidence of monetary loss caused by the clouded title." Id., 674; contra *Fountain Pointe, LLC* v. *Calpitano*, 144 Conn. App. 624, 657, 76 A.3d 636 (evidence presented that cloud on title "caused the plaintiff to

lose out on the proceeds of a $1.8 million sale of its property"), cert. denied, 310 Conn. 928, 78 A.3d 147 (2013). In her trial testimony, Beth Jepsen acknowledged that the plaintiffs had not attempted to sell or rent their property and did not have a comparative market analysis performed. Asked directly if she knew "how much [her] property was devalued," Beth Jespen replied, "No, I don't." She also conceded that the plaintiffs' use of the beach was not impaired following the recording of the 2011 and 2014 modifications on the land records.[51]

Speculation and conjecture do not suffice for proof of pecuniary loss. See *American Diamond Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 513, 28 A.3d 976 (2011) ("the plaintiff bears the burden of producing evidence of sufficient quality to permit the fact finder to award damages without resort to conjecture or speculation"); *Smith* v. *Whittlesey*, 79 Conn. 189, 193, 63 A. 1085 (1906) (fact finder must be presented with evidence of pecuniary loss and is "not permitted to resort to mere conjecture"). We concur with the trial court that the record here lacks evidence of actual, rather than hypothesized, pecuniary loss. In light of the foregoing, the court properly rendered judgment in favor of the defendants on the slander of title claims.

III

As a final matter, we briefly address the plaintiffs' contention that the court abused its discretion in declining to render an award of attorney's fees in their favor due to the allegedly frivolous filing of a special defense by certain defendants. We do not agree.

Prior to trial, certain defendants raised, as a special defense, allegations that the plaintiffs possessed knowledge of the drafting of the 2011 and 2014 modifications but refused to participate.[52] At trial, no evidence was presented to substantiate those allegations.

In its memorandum of decision, the court noted that "[c]laims for attorney's fees and costs, if any, have been reserved by agreement of the parties for posttrial motions." The plaintiffs thereafter filed a motion for attorney's fees and costs pursuant to General Statutes § 52-245[53] and Practice Book § 13-25,[54] predicated on the defendants' special defense that the plaintiffs possessed knowledge of the modifications to the beach deed but refused to participate. In that motion, the plaintiffs averred that they had expended attorney's fees in response thereto, and emphasized that no evidence to support those allegations was presented at trial. The plaintiffs thus argued that it was "appropriate for [the] court to award reasonable attorney's fees and double costs . . . ." The court declined that request, concluding that such an award was not warranted.

"Whether to award attorney's fees is a quintessential example of a matter entrusted to the sound discretion

of the trial court." *Grovenburg* v. *Rustle Meadow Associates, LLC,* supra, 174 Conn. App. 96. "An abuse of discretion in [granting or denying attorney's fees] will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *Hornung* v. *Hornung,* 323 Conn. 144, 170, 146 A.3d 912 (2016). On our thorough review of the record, we cannot say that the court abused its discretion in denying the plaintiffs' request for attorney's fees and costs in the present case.

The judgment is reversed only as to the fourth count of the plaintiffs' complaint and the case is remanded with direction to render judgment declaring the 2014 modification invalid. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiffs also have raised claims concerning a reverter clause in the beach deed, their request to quiet title to the property in question, the applicability of the Common Interest Ownership Act, General Statutes § 47-200 et seq., and various constitutional rights under the state and federal constitutions that allegedly have been violated by the modification of the beach deed. In light of our resolution of the principal issue in this appeal, we do not address those contentions.

[2] The operative complaint, the plaintiffs' third amended complaint, named as defendants Beth M. Camassar, Reuben Levin, Lenore Levin, Edwin J. Roland, Mary B. Roland, Richard L. Thibeault, Theresa Tuthill, David Eder, Estella C. Kuptzin, Ronald J. Wofford, Jeffrey R. Seidel, Bethany R. F. Seidel, Eunice Greenberg, Trustee, Emily S. King, Daniel S. Firestone, Hope H. Firestone, Leonard T. Epstein, Sandra R. Epstein, Eric Parnes, Marilyn Parnes, Anthony C. Polcaro, Joanne L. Polcaro, John A. Spinnato, Janine, Stavri, Sophocles Stavri, Robert McLaughlin, Jr., Roberta I. McLaughlin, Stanley Banks, Elaine Banks, Shirley Gottesdiener, Trustee, Jerry C. Olson, Vivian C. Stanley, David M. Goebel, Earline B. Goebel, Ronald E. Beausoleil, Pamela Beausoleil, Marian E. Dippel, Marilyn Simonson, Barry Weiner, Cynthia C. Weiner, Debra B. Gruss, Savas S. Synodi, Christine Synodi, Barbara Sinclair, Richard Sinclair, Michael P. Shapiro, Elaine P. Shapiro, Miriam Levine, John Oliva, Nancy Krant, Mary Margaret Kral, Trustee, Kenneth C. Wimberly, Dawn Hickey Thibeault, James J. Correnti, Willa M. Correnti, Arnold D. Seifer, Judith A. Pickering, Hugh F. Lusk, Anne Marie Mitchell, Paul Burgess, Deborah Burgess, Michael J. Raimondi, Anne Marie Lizarralde, Manuel Lizarralde, George Synodi, and Maria S. Synodi. In that complaint, the plaintiffs alleged that those defendants "either had, on August 25, 2011, or now have an ownership interest in property located in [the subdivision]" or "either had, on December 23, 2014, or now have an ownership interest in property located in [the subdivision]."

The complaint also named, as interested persons to the declaratory action pursuant to Practice Book § 17-56, Jean P. Tuneski, J. Robert Tuneski, Frank J. Pezzello, Mary D. Passero, Michael E. Passero, Rabbi Carl Astor, Congregation Beth El of New London, Inc., William Keating, Mary J. Keating, Michael Levine, Craig Barrila, Frank Fazio, Antionette Foster, Leila Shakkour, Willa M. Correnti, James J. Correnti, and Paul J. Botchis. With respect to those interested persons, the plaintiffs alleged that they "either had, on August 25, 2011, or now have an ownership interest in [property] located in [the subdivision], but did not participate in the [m]odification hereinafter complained of" or "either had, on December 23, 2014, or now have an ownership interest in [property] located in [the subdivision], but did not participate in the [m]odification hereinafter complained of . . . ."

[3] On the first day of trial, the parties filed a stipulation of facts with the court, in which they stipulated, inter alia, that the language contained in the warranty and beach deeds that were marked as plaintiffs' exhibits 1 and 2 was "identical to the language contained in the [warranty] and beach deeds in the chains of title of all of the owners in the [subdivision]."

[4] Section 2 of the beach deed provides in relevant part: "[T]he Grantee, his heirs and assigns, shall use and have access to the premises conveyed

in common with those to whom interests in said land have or may hereafter be granted solely for the purpose of sitting, taking family meals, and/or bathing upon the beach included within the northerly and southerly sides of said lot when projected in the same courses indefinitely toward the southeast. It being understood and agreed that said use of the premises by the grantee shall be limited to the grantee, his heirs and assigns, and those who dwell with and form a part of the family of the grantee upon the [beach] premises . . . conveyed by this grantor to this grantee by deed of even date herewith, and lodged for record herewith in the New London Land Records, and shall be exercised by the grantee and his family only during such times as they shall dwell on the premises last referred to. In the event the grantee shall lease the premises last referred to, the tenant thereof and those who dwell with and form a part of the family of said tenant may exercise the use to the same extent as the grantee and in lieu of the grantee's right to so use during the term of the lease. The word family as used herein shall have the same meaning as the term is defined in the [warranty deed] . . . ." The warranty deed, in turn, defines "family" as "any collective body of persons who regularly reside together and form a single household, but shall not be deemed to include lodgers or boarders."

[5] We note in this regard that the beach deed states that "the Grantor . . . has remised, released, and forever QUITCLAIMED, and does by these presents, for itself and its successors and assigns justly and absolutely remise, release and forever QUITCLAIM until the said Grantee, his heirs and assigns, an undivided one-forty-eighth (1/48th) interest in" the beach. Prior to reciting the restrictive covenants governing the use of the beach, the beach deed states that "[t]he Grantee, by the acceptance of this deed covenants with Grantor, its successors and assigns, for the benefit of said Grantor, its successors and assigns and for all those who interest in said land may hereafter be granted . . . ."

[6] The December 16, 2015 stipulation of facts filed by the parties states that "[t]he Billard Beach Association is a voluntary organization and has no authority over its members or other [subdivision] owners." In its memorandum of decision, the court emphasized that "the court and all parties are bound by the stipulation for purposes of this litigation."

[7] It is undisputed that, at all relevant times, Garon Camassar was not an owner of property in the subdivision.

[8] Section 7 of the 2011 modification stated: "Any [o]wner of a [r]esidential [l]ot may enforce any of the provisions of this agreement by way of injunctive relief in the Superior Court, New London Judicial District, and with respect thereto, shall be entitled to compensatory damages as well as punitive damages, as the Court may deem appropriate. In addition to the foregoing the prevailing party shall be entitled to reasonable attorney's fees and costs incurred as a result of such action."

[9] An unsigned copy of the bylaws of the association, as amended on July 23, 1990, was admitted into evidence at trial. Pursuant to those bylaws, the affairs of the association are governed by its executive committee, which "shall consist of nine members of the Association in good standing. . . ." The record indicates that the executive committee alternatively is referred to as the "board" by members of the association. At trial, counsel for both the plaintiffs and the defendants clarified for the record that the terms "board" and "executive committee" were used synonymously.

[10] At trial, counsel for the defendants conceded that the 2011 modification was, as the plaintiffs' counsel put it, "void from the get-go."

[11] A withdrawal later was filed on behalf of Barrila by Attorney Mark E. Block on August 19, 2013. On March 3, 2014, Beth Jepsen was cited in as an additional party plaintiff.

[12] Defendant Robert McLaughlin, Jr., who was the president of the association at the time that the 2014 modification was drafted, offered undisputed testimony that he crafted the language of that document with Garon Camassar and Attorney Edward O'Connell.

[13] The 2014 modification revised the restrictive covenants contained in § 2 of the beach deed as follows: "(2) The [o]wners, their heirs and assigns, shall use and have access to and the right to use the [beach] in common with those to whom interests in said [beach] have or may hereafter be granted solely for the purpose of sitting, taking family meals, bathing and/or related activities upon the beach included within the northerly and southerly sides of said [beach] when projected in the same courses indefinitely toward the southeast. It being understood and agreed that said use of the [beach] by the [o]wners shall be limited to the [o]wners, their heirs and assigns, and those who dwell with and form a part of the family of the [o]wners, and

to their parents, children and grandchildren, whether or not such parents, children or grandchildren dwell upon a [r]esidential [l]ot. The word 'family' as used herein shall be construed to mean any collective body of persons who regularly reside together and form a single household, but shall not be deemed to include lodgers or boarders.

"(3) (a) Those persons who dwell in the residence who are [o]wners of the [r]esidential [l]ots appurtenant hereto (but not their parents, children or grandchildren) may invite [d]ay [g]uests to the [beach], not exceeding ten (10) in number. Provided, however, that an [o]wner of the [r]esidential [l]ot referred to herein be in attendance when such [o]wner's [d]ay [g]uests are present. A [d]ay [g]uest is an [o]wner's visitor who does not stay overnight at the [o]wner's residence.

"(b) Those persons who dwell in the residence who are [o]wners of the [r]esidential [l]ots appurtenant hereto (but not their parents, children or grandchildren) may invite [h]ouse [g]uests to the [beach], not exceeding five (5) in number. An [o]wner need not be in attendance when a [h]ouse [g]uest is present at the [beach]. A [h]ouse [g]uest is an [o]wner's visitor who is an overnight guest at the [o]wner's residence.

"(4) In the event the [o]wners shall lease a [r]esidential [l]ot, the tenant thereof and those who dwell with and form a part of the family of said tenant may exercise the use of the [beach] to the same extent as the grantees and in lieu of the grantees' right to so use during the term of the lease.

"(5) Use of the [beach] by all persons, whether [o]wner, family member, tenant or guest, is further subject to the following:

"a. Guests, as defined in [§] 3, may not exceed six (6) in number on Saturdays, Sundays and [l]egal [h]olidays between May 25th and September 10th of each year.

"b. All campfires must be completely extinguished upon completion of use and all coals must be removed from the [beach] at the end of such use. No guest shall be permitted to maintain a campfire without the presence of an [o]wner.

"c. Any garbage or debris generated from use or presence on the beach shall be removed from the [beach] at the time that the [o]wner, family member, tenant or guest departs the [beach].

"d. No beach parties shall be conducted earlier than 5 P.M. or later than 10 P.M. of any day.

"e. No dogs, cats or other pets are permitted on the [beach] between May 25th and September 10th of each year.

"f. No excessive noise shall be generated on the [beach] at any time.

(6) If a [r]esidential [l]ot [o]wner anticipates that the number of guests will exceed the limits set forth in [§§] 3 and 5 hereof, the [o]wner shall notify an officer of the [association] of the proposed gathering. Such officer shall advise the [o]wner if any other gatherings are scheduled for the same date and time. If a conflict with a previously scheduled gathering exists, the [o]wner shall adjust his or her scheduled gathering as required. Any such gatherings shall not be held on weekends before 5:00 P.M."

[14] Section 7 of the 2014 modification provides: "The restrictions on the use of the premises contained in [§§] 2 through 5 hereof may be modified by a written vote of a majority of the Residential Lot Owners, in form suitable for recording in the New London Land Records. Each owner (or in the case of joint ownership or ownership in co-tenancy, such joint owners or owners in co-tenancy together) shall be entitled upon such vote to such number of votes as the numerator of their fractional interest in the property conveyed."

[15] At trial, Beth Jepsen provided uncontroverted testimony that Lizarralde's notice of the association's October 10, 2014 annual meeting, at which the 2014 modification was to be voted upon, was provided to owners of forty-one properties in the subdivision. In its memorandum of decision, the court likewise found that Lizarralde's October 3, 2014 notice was furnished to owners of forty-one of the forty-eight properties.

[16] That document stated: "The undersigned, an owner of property in the Billard subdivision herewith moves or votes as follows:

"a. With respect to the Annual Meeting of the [association], I herewith give my proxy to vote at the Annual Meeting to be held on October 10, 2014, to [blank].

"b. With respect to the Amended and Restated Covenants and Restrictions [contained in the 2014 modification], I herewith vote as follows:

"a. That the [2014 modification] be adopted.

"b. That the [2014 modification] be rejected.

"Dated at New London, Connecticut this [blank] day of [blank], 2014.

"Property Owner [blank]."

[17] That notice stated: "Notice is hereby given that the Annual Meeting of the [association] shall be held on October 10, 2014, at the New London Senior Center, 120 Broad Street, New London, Connecticut, to transact the following business:

"a. Election of Officers and Directors;

"b. To vote upon the [2014 modification];

"c. To establish the dues structure for the upcoming year;

"d. Discussion of old business and new business;

"e. To transact any and all other business which may lawfully come before said meeting.

"f. Adjournment.

"Dated at New London, Connecticut this 2nd day of October 2014.

"Billard Beach Association Board."

[18] A sign-in sheet titled "BILLARD BEACH LOT OWNERS 2014 (48) 2014 Annual Meeting October 10th" was admitted into evidence at trial. That document indicates that owners of twenty properties attended the October 10, 2014 annual meeting.

[19] One recipient of that communication, defendant Miriam Levine, replied to Lizarralde by e-mail that she "never voted yes to anything," which affirmation is confirmed by the proxy signed by Levine on October 9, 2014, in which Levine voted against the 2014 modification. Both Levine's e-mail to Lizarralde and Levine's October 9, 2010 proxy vote were admitted into evidence at trial.

[20] Two owners who cast proxy votes in favor of the 2014 modification, Mary Margaret Kral and Cynthia C. Weiner, ultimately did not sign the 2014 modification.

[21] Those signatures were made on various dates in November and December of 2014. It is undisputed that notice of the signing of the 2014 modification was not furnished to all property owners in the subdivision.

[22] We reiterate that both a copy of the 2014 modification filed on the New London land records and the defendants' September 22, 2015 notice of compliance with the plaintiffs' request for production, which included "[c]opies of all proxies submitted in conjunction with the [2014 modification]," were admitted into evidence at trial as plaintiffs' exhibits 7 and 24. Those exhibits indicate, and the parties do not dispute, that owners of seven properties that did not submit a written vote or proxy nevertheless signed the 2014 modification. They are: (1) Reuben Levin, Trustee, and Lenore Levin, Trustee; (2) Stanley Banks and Elaine Banks; (3) Kenneth C. Wimberly; (4) Eunice Greenberg, Trustee; (5) Estella C. Kuptzin; (6) Frank J. Pezzello and Debra B. Gruss; and (7) Hugh F. Lusk, for whom Janine Fay signed as "His Attorney-in-Fact."

[23] Following the close of the plaintiffs' case-in-chief on December 22, 2015, the defendants moved for a judgment of dismissal on the two slander counts, which the court denied. The defendants then rested without presenting any evidence.

[24] With respect to the notice issue, the plaintiffs stated that they "believe that fifteen days notice would be adequate advance notice, if it was given to all forty-eight owners, and if the notice included an explanation or warning as to how it differed from the original beach deed or how it would change owners' rights. However, those criteria were not met."

[25] The plaintiffs raised similar claims in the pretrial memorandum of law that they filed with the court on December 14, 2015.

[26] In its memorandum of decision, the court cited to plaintiffs' exhibit 24 and the "testimony of Beth Jepsen December 19, 2015" to substantiate that finding. Exhibit 24 is the response to the plaintiffs' request for production that was filed by the defendants and admitted into evidence. It contains copies of all ballot/proxies that were "submitted in conjunction with the 2014 deed modification." Only twenty-four votes in favor of the 2014 modification are contained therein.

We further note that Beth Jepsen did not offer any testimony on December 19, 2015, but rather testified on December 22, 2015. Nowhere in her testimony does Jepsen acknowledge that any additional "votes in favor" were cast by property owners. Rather, Jepsen testified only that owners of twenty-eight or twenty-nine properties ultimately *signed* the 2014 modification. As she testified on cross examination:

"[The Defendants' Attorney]: How many people signed the 2014 document?

"[Jepsen]: I don't know individual people but I know it was about twenty-eight or twenty-nine properties.

"[The Defendants' Attorney]: So that's a majority?

"[Jepsen]: That's a majority of signatures. It's not a majority vote."

[27] Following the commencement of this appeal, the plaintiffs asked the court to articulate as to various factual and legal issues. Relevant to this appeal are two such requests. First, the plaintiffs asked the court to articulate whether "the proxy/ballots collected constituted a majority written vote, which was later memorialized by signature on the 2014 Modification, and if so, what was the proper process that the court found to be undertaken in that vote." Second, the plaintiffs asked the court to articulate "the basis for court's finding that 'seven more votes in favor . . . were received and accepted in the weeks thereafter' and further articulate how many proxies/ballots were accepted in that time period as opposed to how many 'signed documents' were accepted." The court heard argument on that motion on October 28, 2016, and thereafter issued a two-page articulation of its decision that did not address either of those two requests. The plaintiffs filed a motion for review of that articulation with this court, in which it argued that the trial court had "failed to articulate the factual and legal basis of its determinations that appropriate 'due process,' 'notice' and a 'vote' had occurred." This court granted that motion but denied the relief requested.

[28] Section 4 is one of five enumerated covenants in the beach deed. It states: "That the restrictions on the use of the [beach] contained in [§] 2 hereof may be modified by a majority vote in writing of the owners of the premises conveyed. Each owner, (or in the case of joint ownership or ownership in co-tenancy, such joint owners or owners in co-tenancy together) shall be entitled upon any such vote to such number of votes as the numerator of their fractional interest in the premises conveyed, and upon any such vote, the majority shall be determined according to the sum of the votes so counted."

[29] In its memorandum of decision, the court stated that "the plain language of the [1959] beach deed . . . specifically allows the owners of a majority of the house lots to modify the restrictions on the beach uses set forth in [§] 2."

[30] Section 7 of the 2014 modification states in relevant part that "[t]he restrictions on the use of the premises contained in [§§] 2 through 5 hereof may be modified by a written vote of a majority of the Residential Lot Owners, in form suitable for recording in the New London Land Records. . . ." Section 7 of the 2014 modification also eliminated the requirement of § 4 of the beach deed that "upon any such vote, the majority shall be determined according to the sum of the votes so counted." See footnotes 14 and 28 of this opinion. In addition, §§ 8 through 12 of the 2014 modification all contain modifications to other provisions of the beach deed that do not pertain to the restrictions on the use of the beach set forth in § 2 of the beach deed.

[31] We note that the plaintiffs alternatively argue that the 2014 modification failed to comply with the requirement of "a written vote of at least 75 percent of the Residential Lot Owners" in the subdivision, as provided in the 2011 modification filed on the New London land records. At oral argument, the plaintiffs acknowledged that, if this court concludes that the 2014 modification was improperly enacted without "a majority vote in writing" of the owners of the forty-eight properties in the subdivision, as required by § 4 of the beach deed, there is no need to address that alternative contention.

[32] As our Supreme Court recently observed, "[a]lthough in most contexts the issue of intent is a factual question on which our scope of review is limited . . . the determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary." (Internal quotation marks omitted.) *Deane* v. *Kahn*, 317 Conn. 157, 166, 116 A.3d 259 (2015).

[33] Section 4.1 of the Restatement states: "(1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.

"(2) Unless the purpose for which the servitude is created violates public policy, and unless contrary to the intent of the parties, a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred." 1 Restatement (Third), supra, § 4.1, pp. 496–97.

[34] Despite a canvass of state and federal decisional law across this nation, we have discovered no authority involving a deed or contract with the "majority vote in writing" or the "votes so counted" language at issue in the present case.

[35] "The word 'such' has been construed as a related adjective referring

back to and identifying something previously spoken of and that it naturally, by grammatical usage, refers to the last precedent." (Internal quotation marks omitted.) *Nichols* v. *Warren*, 209 Conn. 191, 197, 550 A.2d 309 (1988).

[36] In the operative complaint, the plaintiffs alleged that "[o]ne or more provisions of the 2014 Modification is contrary to the property interests of the Plaintiffs and all owners of interests in [the subdivision]" and that "[t]he 2014 Modification deprived individual owners of the land lots of significant property . . . rights."

[37] Accord *Chapman* v. *Sheridan-Wyoming Coal Co.*, 338 U.S. 621, 626–27, 70 S. Ct. 392, 94 L. Ed. 393 (1950) (concluding that restrictive covenant was a "property right" similar to an easement); *Harris* v. *Pease*, supra, 135 Conn. 539–40 ("[t]he right of [the property owner] and his successors in title to have the [restrictive covenant] continued in force is a property interest which they have in [the property subject to that covenant]"); *Grovenburg* v. *Rustle Meadow Associates, LLC*, supra, 174 Conn. App. 45 ("the right of one property owner to the protection of a restrictive covenant is a property right just as inviolable as is the right of others to the free use of their property when unrestricted" [internal quotation marks omitted]); *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 428, 780 A.2d 967 ("the defendant possessed a property right that it had bargained for when it purchased its land"), cert. granted, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002); *135 Wells Ave., LLC* v. *Housing Appeals Committee*, 478 Mass. 346, 357 n.10 and 358, 84 N.E.3d 1257 (2017) (noting that "deed restrictions are a property interest, a restrictive covenant on land" and describing restrictive covenants as "real property rights"); *Malcolm* v. *Shamie*, 290 N.W.2d 101, 102 (Mich. App. 1980) ("restrictive covenants are valuable property rights subject to judicial protection"); *Cunningham* v. *Gross*, 102 N.M. 723, 725, 699 P.2d 1075 (1985) (restrictive covenants "constitute valuable property rights of all lot owners" in subdivision); *Crane Neck Assn., Inc.* v. *NYC/Long Island County Services Group*, 92 App. Div. 2d 119, 122, 460 N.Y.S.2d 69 (1983) ("restrictive covenants constitute private property rights which must be observed by the State"), aff'd, 61 N.Y.2d 154, 460 N.E.2d 1336, 472 N.Y.S.2d 901 (1984); Restatement (Third), supra, § 7.8, reporter's note, p. 383 ("in this Restatement, all servitude benefits are treated as property rights").

[38] Section 4.10 of the Restatement addresses use rights conferred by servitude and notes that the holder of an instrument memorializing such rights "is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. . . ." 1 Restatement (Third), supra, § 4.10, p. 592. In "balancing the interests" of various holders, the Restatement recognizes that "neighborhood preservation concerns should be" a relevant consideration. Id., comment (h), p. 602. The requirement of a formal vote at which all property owners are afforded an opportunity to vote on any proposed modification to their beach use rights, rather than an effort to simply secure a majority of signatures on a document, strikes us as far more conducive to neighborhood preservation.

[39] As our Supreme Court has observed, "[a]ctions may be held to speak louder than words . . . ." *Malone* v. *Santora*, 135 Conn. 286, 292, 64 A.2d 51 (1949). The construction advanced by the defendants is belied by the fact that the proponents of the 2014 modification deemed it necessary to both conduct a formal vote at the October 10, 2014 association meeting, and to materially alter the modification provisions of the beach deed. In part I A of this opinion, we concluded that those revisions to the modification provisions of the beach deed are invalid, as they were not enacted by unanimous consent of the owners of the forty-eight properties in the subdivision.

Significantly, the 2014 modification amended the modification provisions of § 4 of the beach deed in several crucial respects. First, § 7 of the 2014 modification replaced "modified by a majority vote in writing of the owners" with "modified by a written vote of a majority of the Residential Lot Owners, in form suitable for recording in the New London Land Records." See footnote 14 of this opinion. Second, the 2014 modification eliminated altogether the requirement of § 4 that "upon any such vote, the majority shall be determined according to the sum of the votes so counted." In contrast to § 4 of the beach deed, all that is required to modify the restrictions on the use of the beach under the 2014 modification is the filing on the land records of an instrument signed by the owners of a majority of the properties in the subdivision.

In addition, § 12 of the 2014 modification inserted new language regarding the manner in which such an instrument to modify the beach deed may be

executed. That new section states that "[t]his Amendment and Restatement may be signed by the respective Owners in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument." "In counterparts," known also as "execution in counterparts," is a term of art that refers to the practice of compiling various documents and/or signatures to a contract and treating the combination thereof as a single agreement. See, e.g., *Aubin* v. *Miller*, Superior Court, judicial district of Fairfield, Docket No. CV 98-0355768-S (April 10, 2000), aff'd, 64 Conn. App. 781, 781 A.2d 396 (2001); *Central Basin Municipal Water District* v. *Fossette*, 235 Cal. App. 2d 689, 751, 45 Cal. Rptr. 651 (1965); *Industrial Heat Treating Co.* v. *Industrial Heat Treating Co.*, 104 Ohio App. 3d 499, 505, 662 N.E.2d 837, review denied, 74 Ohio St. 3d 1477, 657 N.E.2d 784 (1995). In the present case, the proponents of the 2014 modification utilized the very practice memorialized in § 12 of the 2014 modification in enacting the 2014 modification, as the signatures on that instrument appear on various documents bearing divers dates between November 9, 2014 and December 17, 2014. It nonetheless remains that § 4 of the beach deed contains no provision for that practice.

[40] We reiterate that § 4 of the beach deed pertains solely to the modification of the restrictions on the use of the beach contained in § 2 of the beach deed.

[41] In finding that Lizarralde's October 3, 2014 notice of the vote on the 2014 modification was provided to owners of only forty-one of the forty-eight properties in the subdivision, the court in its memorandum of decision stated that "[i]t appears that the [proponents of the 2014 modification] lacked the e-mail and home addresses for a few of the property owners . . . ." The court then cited to Lizarralde's trial testimony on December 18, 2015, in support of that finding. A review of the transcripts reveals that no such statement is contained in Lizarralde's testimony or the testimony of any witness regarding the enactment of the 2014 modification. That finding thus is clearly erroneous. See *McBurney* v. *Paquin*, 302 Conn. 359, 368, 28 A.3d 272 (2011). Moreover, "a simple review of the town assessor's online records" would have disclosed the addresses of all property owners. *Sinoway Family Partnership* v. *Zoning Board of Appeals*, 50 Conn. Supp. 513, 522–23, 947 A.2d 20 (2007).

[42] Cf. *Grovenburg* v. *Rustle Meadow Associates, LLC*, supra, 174 Conn. App. 82–83 ("[t]he concept of notice concerns notions of fundamental fairness, affording parties the opportunity to be apprised when their interests are implicated in a given matter" [internal quotation marks omitted]); 9 Powell on Real Property, supra, § 60.08, p. 115 (noting that, with respect to modification of restrictive covenants, "[i]n all cases, due process must be observed as to general amendment and voting procedures").

[43] The plaintiffs also were not accompanied by legal counsel at the October 10, 2014 association meeting.

[44] We cannot speculate as to what impact the failure to provide notice to all property owners had on the formal vote on the 2014 modification, or whether such notice would have impacted the decisionmaking of other owners in the subdivision. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009) (speculation and conjecture have no place in appellate review).

[45] Those minutes state in relevant part that McLaughlin, who at that time was president of the association, began the meeting by stating that "we [are] here to discuss the adoption of the [2014 modification]." The minutes further state that "[t]he vote for this [2014 modification] would remain open until November 1 . . . ."

[46] In her November 6, 2014 e-mail to certain owners, Lizarralde stated in relevant part: "Many thanks to everyone who voted yes to amend the [beach deed]. We received a majority of yes votes and so . . . we now need to have each of you sign the official document that will be notarized. . . ." At trial, Lizarralde testified that a majority of written votes in favor of the 2014 modification had not been received at that time.

[47] In their appellate brief, the defendants claim that the proxies completed by owners of twenty-six properties do not constitute votes because "there were issues other than the [2014] modification on the October meeting agenda that required votes, and that the proxies applied to those issues." That contention is untenable, as the sole matter specified on the "BILLARD BEACH ASSOCIATION BALLOT OR PROXY" was the "vote" to either adopt or reject the 2014 modification. See footnote 16 of this opinion.

[48] We repeat that, prior to trial, the plaintiffs served a request for production on the defendants, in which they sought, inter alia, "[c]opies of all proxies submitted in conjunction with the 2014 Deed Modification." The defendants

complied with that request, and produced copies of twenty-six proxy votes, which were admitted into evidence at trial.

[49] We acknowledge that the plaintiffs' complaint also sought to have the court quiet title to the beach. In its memorandum of decision, the trial court did not address that request. See *NPC Offices, LLC* v. *Kowaleski*, 320 Conn. 519, 534, 131 A.3d 1144 (2016). In light of the trial court's declaration that the 2011 modification is null and void, and our conclusion that the 2014 modification likewise is invalid, further consideration of the plaintiffs' quiet title request is unnecessary. As a result of our decision today, title to the beach remains as it was prior to the enactment of the 2011 and 2014 modifications.

[50] For example, McLaughlin testified that the modifications were enacted to protect owners in the subdivision for liability and insurance purposes. Beausoleil testified that, despite his efforts, the association was unable to obtain insurance on the beach. Firestone similarly testified that the proponents of the modifications were "afraid of insurance situations. . . . We were worried as homeowners" about activity on the beach.

[51] At trial, Beth Jepsen was asked whether, "[o]utside of the modification, has anyone in [the subdivision], an owner, a member of the board, a member of the association in any way interfered with your use of the beach?" She answered, "No. They didn't enforce their document." Beth Jepsen further testified that, since those modifications were enacted, no one had asked a guest of theirs to leave the beach.

[52] As two examples of the special defenses at issue, we note that the April 30, 2012 answer and special defenses filed by defendants Christine Synodi and Savas Synodi alleges in relevant part: "Upon information and belief, the [p]laintiffs had notice of the [m]odification . . . and refused any opportunity to review the same; therefore, [p]laintiffs must therefore be equitably estopped from claiming [that] 'The [m]odification was enacted without the knowledge and consent of the [p]laintiffs . . . .' " The September 22, 2015 answer and special defenses filed by four dozen defendants similarly alleges that the plaintiffs "had notice of the proposed modifications to the covenants and restrictions, but declined to participate in meaningful discussions regarding same. If they had any right to notice and an opportunity to be heard regarding said modifications, they have waived any such right that may exist."

[53] General Statutes § 52-245 provides: "In any case in which an affidavit has been filed by the defendant, or a statement that he has a bona fide defense has been made to the court by his attorney, and the plaintiff recovers judgment, if the court is of the opinion that such affidavit was filed or statement made without just cause or for the purpose of delay, it may allow to the plaintiff, at its discretion, double costs, together with a reasonable counsel fee to be taxed by the court."

[54] Practice Book § 13-25 provides: "If a party fails to admit the genuineness of any document or the truth of any matter as requested herein, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, such party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The judicial authority shall make the order unless it finds that such failure to admit was reasonable."